## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| SHIRLEY TROTTER and | ) |
| ERNIE TROTTER, parents of | ) |
| RYAN TROTTER, deceased, | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| vs. | )   Case No. 05-cv-0205-MJR |
| | ) |
| B & W CARTAGE COMPANY, INC., | ) |
| | ) |
| Defendant. | ) |

## MEMORANDUM and ORDER

REAGAN, District Judge:

This action is before the Court on the Motion for Summary Judgment on Punitive

Damages brought by Defendant B & W Cartage Company, Inc. ("B & W") (Doc. 52).  For the

following reasons, the motion is **DENIED**.

### INTRODUCTION

On Friday, February 4, 2005, Ryan Trotter, a 21-year-old engineering student, was

driving to his family home in Bridgeton, Missouri, to spend the weekend with his parents

Shirley Trotter and Ernie Trotter, Plaintiffs herein, and to attend a dental appointment in St. Louis,

Missouri.  At about 12:20 p.m. that day Ryan Trotter was traveling eastbound on U.S. Interstate

Highway 44 at or near Cuba, Missouri, when a B & W tractor-trailer truck operated by

Jeffrey Wiegert that was traveling westbound on Interstate 44 jumped the median.  The tractor-trailer

collided with three eastbound cars, including Ryan Trotter's car, which was pinned under the tractor-

trailer.  Although Ryan Trotter suffered no trauma due to the collision, he was killed when,

approximately eight to ten minutes after the collision, the tractor-trailer's gas tank exploded,

resulting in a fire that engulfed his vehicle in flames.  At the time of the collision, the evidence of

record indicates, Jeffrey Wiegert was significantly over his hours of service limits as mandated by the Federal Motor Carrier Safety Regulations ("FMCSRs") promulgated by the Federal Highway Administration ("FHWA").

Ryan Trotter's parents have brought this action against B & W for wrongful death. By Order entered May 26, 2005, the Court held that this action is governed by the substantive law of Missouri.  *See* **Restatement (Second) of Conflict of Laws §§ 145-146 (1971)**.  *See also In re Air Crash Disaster Near Chicago, Ill. on May 25, 1979*, **644 F.2d 594, 611 (7th Cir. 1981); *Ingersoll v. Klein*, 262 N.E.2d 593, 595-96 (Ill. 1970)**.  B & W has moved for partial summary judgment as to the Trotters' claim for punitive damages.

## DISCUSSION

### A.    Legal Standard

Summary judgment may be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." **Fed. R. Civ. P. 56(c)**.  *See also Bank of Ill. v. Allied Signal Safety Restraint Sys.*, **75 F.3d 1162, 1168 (7th Cir. 1996)**.  A motion for summary judgment may be rendered in whole or in part as to various issues in a case, *see **Weva Oil Corp. v. Belco Petroleum Corp.**, **68 F.R.D. 663, 667 (N.D.W.Va. 1975)**, including the issue of the availability of punitive damages. *See **Blakely v. Austin-Weston Center for Cosmetic Surgery L.L.C.**, 348 F. Supp. 2d 673, 681 (E.D. Va. 2004)**.

In considering a summary judgment motion, a court must review the entire record and draw all reasonable inferences in the light most favorable to the non-moving party.  *See*

*NLFC, Inc. v. Devcom Mid-America, Inc.*, **45 F.3d 231, 234 (7th Cir. 1995);** *Enquip, Inc. v. Smith-McDonald Corp.*, **655 F.2d 115, 118 (7th Cir. 1981)**.  On summary judgment a court may not make credibility determinations or weigh the evidence, because these are tasks for a factfinder. *See Anderson v. Liberty Lobby, Inc.*, **477 U.S. 242, 255 (1986);** *Betaco, Inc. v. Cessna Aircraft Co.*, **32 F.3d 1126, 1138 (7th Cir. 1994)**.  In evaluating a motion for summary judgment, "[t]he court has one task and one task only:  to decide, based on the evidence of record, whether there is any material dispute of fact that requires a trial." *Waldridge v. American Hoechst Corp.*, **24 F.3d 918, 920 (7th Cir. 1994)**.

> B.      **Aggravating Circumstances**

Although Missouri's wrongful death act does not by its express terms provide for punitive damages, it does authorize the trier of fact to consider the "mitigating or aggravating circumstances attending the death." **Mo. Rev. Stat. § 537.090.** *See also Moreland v. Columbia Mut. Ins. Co.*, **842 S.W.2d 215, 220 (Mo. Ct. App. 1992)**.  Thus, "[a]lthough Missouri does not permit punitive damages per se in wrongful death cases, since 1855, it has allowed juries to consider aggravating circumstances in arriving at their verdicts." *Morrissey v. Welsh Co.*, **821 F.2d 1294, 1302 (8th Cir. 1987) (applying Missouri law)**.  Damages for "aggravating circumstances" are in the nature of punitive or exemplary damages. *See Haehl v. Wabash R.R. Co.*, **24 S.W. 737, 741 (Mo. 1893);** *Parsons v. Missouri Pac. Ry. Co.*, **6 S.W. 464, 466-67 (Mo. 1888);** *Letz v. Turbomeca Engine Corp.*, **975 S.W.2d 155, 164 (Mo. Ct. App. 1997)**.  Accordingly, an award for more than compensatory damages in a wrongful death case is permissible only if the decedent would have been entitled to punitive damages had he or she lived. *See Dougherty v. Smith*, **480 S.W.2d 519, 521  (Mo. Ct. App. 1972)**.

To support a claim for damages for aggravating circumstances, there must be clear and convincing evidence in support of the claim. *See Rodriguez v. Suzuki Motor Corp.*, **936 S.W.2d 104, 110 (Mo. 1996)**. Damages for "aggravating circumstances" in wrongful death cases depend on proof of "willful misconduct, wantonness, recklessness, or want of care indicative of indifference to consequences." *Wiseman v. Missouri Pac. R.R. Co.*, **575 S.W.2d 742, 752 (Mo. Ct. App. 1978)**. Specifically, evidence must show that the defendant either knew or had reason to know that there was a high degree of probability that the defendant's conduct would result in injury. *See Hoover's Dairy, Inc. v. Mid-America Dairymen, Inc./Special Prods., Inc.*, **700 S.W.2d 426, 436 (Mo. 1985)**. The defendant's conduct must be tantamount to intentional wrongdoing where the natural and probable consequence of the conduct is injury. *See id.* **at 435**. With such a showing, a plaintiff can recover for aggravating circumstances based upon the defendant's complete indifference to or conscious disregard for the safety of others. *See Alack v. Vic Tanny Int'l of Mo., Inc.*, **923 S.W.2d 330, 338-39 (Mo. 1996)**.

Although neither mitigating nor aggravating circumstances are statutorily defined, the courts, however, have adopted certain guidelines for determining when such damages are available. "The potential and seriousness of harm arising from a breach of duty is inevitably a part of the determination of whether conscious indifference to consequences has been established. The level of care required is directly proportional to the potential of harm arising from the breach." *Schroeder v. Lester E. Cox Med. Ctr., Inc.*, **833 S.W.2d 411, 420 (Mo. Ct. App. 1992)**. *See also Duncan v. Missouri Bd. for Architects, Prof'l Eng'rs & Land Surveyors*, **744 S.W.2d 524, 533 (Mo. Ct. App. 1988)**. In explaining when damages for aggravating circumstances are *not* available, the Supreme Court of Missouri stated:

In the context of a negligence case, the "high degree of probability of injury" and "complete indifference or conscious disregard" standards are somewhat ambiguous. From the negligence cases in which exemplary damages have been disallowed, however, factors that assist in identifying when submission of such damages is permissible can be distilled. Weighing against submission of punitive or aggravating circumstances damages are circumstances in which:  prior similar occurrences known to the defendant have been infrequent; the injurious event was unlikely to have occurred absent negligence on the part of someone other than the defendant; and, the defendant did not knowingly violate a statute, regulation, or clear industry standard designed to prevent the type of injury that occurred.

*Lopez v. Three Rivers Elec. Coop., Inc.*, 26 S.W.3d 151, 160 (Mo. 2000).  *See also Alcorn v. Union Pac. R.R. Co.*, 50 S.W.3d 226, 248 (Mo. 2001).  Conversely, "[s]ubmission of aggravating circumstances is proper when the defendant could have reasonably been charged with knowledge of a potentially dangerous situation but failed to act to prevent or reduce the danger." *Schroeder*, 833 S.W.2d at 420.

### C.    The Evidence of Record

At the heart of this case are certain FHWA regulations governing the hours of service for commercial truck drivers.  Under the Motor Carrier Act of 1935 and the Motor Carrier Safety Act of 1984, the FHWA has the authority to issue regulations pertaining to commercial motor vehicle safety and to enforce those regulations.  *See* 49 U.S.C. §§ 521(b), 31133(a).  Pursuant to that authority, the FHWA promulgated the FMCSRs, the following of which are pertinent to this case:

§ 390.11 Motor carrier to require observance of driver regulations.
Whenever . . . a duty is prescribed for a driver or a prohibition is imposed upon the driver, it shall be the duty of the motor carrier to require observance of such duty or prohibition.  If the motor carrier is a driver, the driver shall likewise be bound.

§ 395.3 Maximum driving time for property-carrying vehicles.
Subject to the exceptions and exemptions in § 395.1:
(a) No motor carrier shall permit or require any driver used by it to drive a property-carrying commercial motor vehicle, nor shall any such driver drive a

property-carrying commercial motor vehicle:

(1) More than 11 cumulative hours following 10 consecutive hours off duty; or

(2) For any period after the end of the 14th hour after coming on duty following 10 consecutive hours off duty, except when a property-carrying driver complies with the provisions of § 395.1(o) or § 395.1(e)(2).

(b) No motor carrier shall permit or require a driver of a property-carrying commercial motor vehicle to drive, nor shall any driver drive a property-carrying commercial motor vehicle, regardless of the number of motor carriers using the driver's services, for any period after –

(1) Having been on duty 60 hours in any period of 7 consecutive days if the employing motor carrier does not operate commercial motor vehicles every day of the week; or

(2) Having been on duty 70 hours in any period of 8 consecutive days if the employing motor carrier operates commercial motor vehicles every day of the week.

§ 395.8 Driver's record of duty status.

(a) Except for a private motor carrier of passengers (nonbusiness), every motor carrier shall require every driver used by the motor carrier to record his/her duty status for each 24 hour period using the methods prescribed [herein] . . . .

* * * *

(e) Failure to complete the record of duty activities of this section or § 395.15, failure to preserve a record of such duty activities, or making of false reports in connection with such duty activities shall make the driver and/or the carrier liable to prosecution.

**49 C.F.R. §§ 390.11, 395.3, 395.8**.

The FHWA has developed regulatory guidance to assist motor carriers and other parties bound by the FMCSRs.  *See* **Regulatory Guidance for the Federal Motor Carrier Safety Regulations, 62 Fed. Reg. 16370 (1997)**.  In this regulatory guidance, the FHWA explains, the agency "consolidated previously issued interpretations and regulatory guidance materials and developed concise interpretive guidance in question and answer form for each part of the FMCSRs." *Id.* at 16370.  *See also United States v. Thorson*, **No. 03-C-0074-C, 2004 WL 737522, at *8 (W.D. Wis. Apr. 6, 2004) ("[A]n agency's interpretation of its own regulations is entitled to a relatively high level of deference . . . . A court must accept the interpretation unless it**

**is . . . plainly erroneous or inconsistent with the regulation.”);** *Hickey v. Great W. Mortgage*

*Corp.*, **No. 94 C 3638, 1995 WL 317095, at \*5 (N.D. Ill. May 23, 1995) (“Deference is**

**particularly appropriate when an agency interprets its own regulation.”)**.  In interpretation of

49 C.F.R. § 395.3, the FHWA’s regulatory guidance states:

> Question 7:  What is the liability of a motor carrier for hours of service violations?
> Guidance:  The carrier is liable for violations of the hours of service regulations if
> it had or should have had the means by which to detect the violations.  Liability
> under the FMCSRs does not depend upon actual knowledge of the violations.
> Question 8:  Are carriers liable for the actions of their employees even though the
> carrier contends that it did not require or permit the violations to occur?
> Guidance: Yes.  Carriers are liable for the actions of their employees.  Neither intent
> to commit, nor actual knowledge of, a violation is a necessary element of that
> liability.  Carriers “permit” violations of the hours of service regulations by their
> employees if they fail to have in place management systems that effectively prevent
> such violations.

**62 Fed. Reg. at 16424**.  In interpretation of 49 C.F.R. § 395.8, the regulatory guidance states:

> Question 21:  What is the carrier’s liability when its drivers falsify records of duty
> status?
> Guidance:  A carrier is liable both for the actions of its drivers in submitting false
> documents and for its own actions in accepting false documents.

**62 Fed. Reg. at 16426**.  In short, “Motor carriers have a duty to require drivers to observe the

FMCSRs.” *Id.*

        In this case there is substantial evidence of record that, at the time of the incident in

which Ryan Trotter was killed, Jeffrey Wiegert was driving well outside his federally-regulated

hours of service, that he was operating a B & W tractor-trailer in a manner consistent with that of

a person driving in a state of extreme fatigue, and that, in the weeks preceding Ryan Trotter’s death,

Mr. Wiegert repeatedly submitted faked logs of his driving hours to B & W.  With respect to the

issue of the availability of damages for aggravating circumstances in this case, the Court finds

particularly noteworthy the testimony of Francis Amiot, B & W’s Director of Safety Rules

Compliance since 1994.

Mr. Amiot testified that B & W's primary means of preventing violations of FHWA regulations governing hours of service for drivers was through computerized scanning of driver logs. Mr. Amiot testified that, as the chief officer of B & W responsible for ensuring the company's compliance with FHWA hours of service regulations, he was aware that the log scanning program had been inadequate to prevent hours of service violations for at least five years prior to Ryan Trotter's death:

> Q. . . . The log scanning program, was it inadequate for purposes of fulfilling the company's obligation with respect to reviewing driver logs to insure [sic] hours of service compliance?
>
> * * * *
>
> A. Did you say antiquated or inadequate?
> Q. . . . Inadequate.
> A. At the time of this incident I have to say, yes.
> Q. At the time of this incident, being in February of 2005?
> A. Correct.
> Q. And had it been inadequate for those purposes for a period of time prior to February of 2005?
> A. Probably, yes.
> Q. Had that before of time been more than a year?
> A. Oh, absolutely.
> Q. Had – had it been – had the log scanning program been inadequate for several years?
> A. That's a fair statement.
>
> * * * *
>
> Q. Is there a point in time when, in your opinion, as the director of – of safety and rule compliance, you felt that the – that the log scanning program became inadequate for the purposes necessary to insure compliance with hours of service regulations?
> A. Yes. We got too big too fast, and in my opinion, it, therefore, became inadequate.
> Q. When did the company become too big too fast?
> A. Over the period of the last five, six, seven years.
> Q. So for a period of approximately five, six, seven years, the log scanning program has been inadequate –

A. We have increased in size, and that –
Q. Go ahead.
A. Go ahead.
Q. For a period of the last five, six, seven years, the log scanning program has been inadequate for purposes of insuring [sic] compliance with hours of service regulations?
A. Yes, to – yes, to the degree we have discussed.

**Deposition of Francis Amiot (attached to Plaintiffs' Memorandum in Opposition to Defendant's Motion for Partial Summary Judgment as Exhibit L) at 200-02**.

Mr. Amiot testified that he brought the issue of the serious failure of B & W to comply with FHWA requirements that motor carriers maintain "management systems that effectively prevent [hours of service] violations," **62 Fed. Reg. at 16424**, to the attention of the company's president, but that B & W, despite having knowledge of the compliance problem, took no action to correct it:

Q. Okay.  Was that brought to the attention of anyone in the company and discussed in any way, that something needs to be done about that?
A. You know, I don't really recall.  Probably, but I don't really recall.  I think I – I think I did at some point in time, but –
Q. Who would you have most likely brought that to the attention of?
A. Mr. Steve Klein [B & W's President].
Q. And do you know if any corrective action or any response was made to that suggestion or recommendation?
A. Not to my knowledge.
Q. Was there a reason that the company operated with an inadequate log scanning program for a period of five or six or seven years?

\* \* \* \*

A. We fell on our mistake.  We made some errors.  We are suffering for it, and we are correcting it.

**Deposition of Francis Amiot at 202-03**.

Mr. Amiot testified that, in the absence of a reliable means of auditing driver logs, B & W's fallback measure was random "hard audits" of driving logs, in which logs were checked

against supporting documentation to determine compliance with hours of service:

> A. . . . From time to time amidst other duties, as we have earlier discussed, I would have randomly selected persons and looked at other relevant documents and compared them to that individual's record of duty status. But who those individuals are, I could not address.
>
> * * * *
>
> Q. . . . . You have talked about this random process. Was there any – any procedure that you followed with respect to this randomness? Did you pull –
> A. No, but –
> Q. – five files a day? Did you pull ten logs a day? Did you pull 20 logs a day? What – what was done? How did you – or was this just kind of haphazard, and whenever you got a few minutes you might have pulled a log?
> A. I think that's a fair statement. By definition, it was random.
> Q. Okay. But in what manner was it random? Did you have any – did you do – did you do a log review, at least one, every day?
> A. I would say within certain realms I did at least one – at least one log every day.
> Q. All right. Did you have any set number that you tried to accomplish per day?
>
> * * * *
>
> A. I did one log a day as a – as an average, I think, is a fair statement.
> Q. I'm sorry. One a day, did you say?
> A. I may have done five a day, I may have done one every other day, I may have done two every other day. I think a fair – a fair average would be one a day.

**Deposition of Francis Amiot at 160-62**. A reasonable inference to be drawn from Mr. Amiot's

testimony is that B & W operated for a substantial period of time, possibly as much as seven years,

in conscious indifference to its duties under the FMCSRs governing driver hours of service.

Mr. Amiot also described resistance within B & W's corporate structure to improved

hours of service compliance:

> Q. So there were issues with terminal and operation managers resisting the recommendations of the safety department?
>
> * * * *
>
> A. No, I don't – I don't think – I don't think I recall any general resistance. Well,

no, I can't say that.  A person at a facility [in Clayton, Ohio,] was very hesitant to accept recommendations of the safety department in regard to hours of service.  And gut reaction, again, my own gut reaction, if you will, was that money took precedent over safety.

Q. . . . I'm sorry, what was the last?

A. Money took precedent over safety.

**Deposition of Francis Amiot at 216-17**.

Importantly, Mr. Amiot specifically testified to questionable hours of service practices by the manager of B & W's terminal in Gary, Indiana, out of which Jeffrey Wiegert operated:

A. I believe there is a person who – at the facility you mentioned, that, in my opinion, stretch – that stretches the regulations to the limit of being still within the law.

Q. The facility –

A. But very questionable.

Q. The facility I mentioned, you are referring to the Gary, Indiana, facility?

A. In my opinion, yes.

Q. And who is that person?

A. Mr. George Drain.

Q. And he is the operations manager or terminal manager in Gary, Indiana?

A. I believe that's his title, yeah.

Q. And you say that in your opinion he – he stretches the hours of service limitations?  What do you mean by that, if you can give me an example.

A. Nothing to the point of being illegal, but it doesn't give the time – the driver a chance to eat.  Mileage distances are figured point A to point B at almost the exact allowable driving time, which disallows any excessive time for perhaps a random drug screen, perhaps a – well, let's – let's leave it at a random drug screen.  The runs – the runs are figured so tight that there is no excessive time to be able to – to do that without expediting the load and causing the driver to lose a day's work.

Q. Did you –

A. Personal opinion.

Q. I assume it's also your professional opinion, too; wouldn't that be correct?

A. I think that's a fair statement.

Q. Did you ever have any discussions with Mr. Drain about his stretching of the hours of service rules and regulations?

A. Yes.

**Deposition of Francis Amiot at 219-20**.  A reasonable inference to be drawn from Mr. Amiot's

testimony is that B & W ignored its duties under FHWA hours of service regulations, put drivers

in positions where they would likely be forced to violate such regulations, and telegraphed to drivers

its approval of violations of the hours of service regulations.

> D.      **Genuine Issues Regarding Aggravating Circumstances**

The Court concludes that, on this record, reasonable jurors could find that the

imposition of damages for aggravating circumstances is warranted.  The evidence of record indicates

that for five years or more prior to Ryan Trotter's death B & W operated with conscious indifference

to its regulatory duty to maintain management systems effective in preventing hours of service

violations by drivers.  The evidence of record also suggests that the conduct of B & W employees

like the managers of the company's terminals in Clayton, Ohio, and Gary, Indiana, was such as to

send a message to drivers that hours of service violations were acceptable conduct.  In fact,

"[m]oney [taking] precedent over safety" is virtually the definition of the kind of corporate behavior

warranting an award of punitive damages.  ***See Grimshaw v. Ford Motor Co.*, 174 Cal. Rptr. 348,**

**358-63 (Cal. Ct. App. 1981) (affirming an award of punitive damages to a boy who had been**

**badly burned in the explosion of a Ford Pinto in which he was a passenger, where the evidence**

**at trial showed that Ford relied on a study that showed that the costs of recalling the Pinto for**

**modification would outweigh the benefits, which were estimated at $200,000 per burn death**

**avoided and $67,000 per injury avoided)**.  ***See also Call v. Heard*, 925 S.W.2d 840, 849**

**(Mo. 1996) ("The well-established purpose of punitive damages is to inflict punishment and**

**to serve as an example and a deterrent to similar conduct.").**

The conclusion that this case presents genuine issues for trial as to aggravating

circumstances damages is buttressed by a review of pertinent Missouri authority.  For example,

in ***Blum v. Airport Terminal Services, Inc.*, 762 S.W.2d 67 (Mo. Ct. App. 1988)**, a wrongful death

action arising from an airplane crash near Lambert Airport in St. Louis, the court held that the

evidence supported an award of damages for aggravating circumstances.  The crash occurred

because a poorly-trained employee of a company hired by the City of St. Louis ("the City"), the

operator of the airport, to provide fueling services at the airport refueled the piston-driven plane with

jet fuel, causing the plane's pistons to lock shortly after takeoff.  ***See id.* at 69**.  The court noted that,

under regulations promulgated by the Federal Aviation Administration ("FAA"), the City had a

"continuing" and "non-delegable" duty as the operator of the airport to ensure "a sufficient number

of trained personnel and procedures for safely storing, dispensing and otherwise handling fuel . . .

including –  . . . marking and labeling storage tanks and tank trucks, including identification of

specific types of fuel octane and designations that fueling personnel and procedures and inadequate

marking of fuel vehicles."  ***Id.* at 76 (quoting 14 C.F.R. § 139.51(b))**.

   The court said regarding an award of aggravating circumstances damages against the

City, "The potential and seriousness of harm arising from a breach of duty is inevitably a part of the

determination of whether conscious indifference to consequences has been established.  The level

of care required is directly proportional to the potential of harm arising from the breach."  ***Blum*, 762**

**S.W.2d at 74**.  The court observed that "[t]he evidence established that the City was aware of the

industry wide problem of misfueling and the efforts of industry groups to correct the problem."

***Id.* at 76**.  The court noted further that fueling at an airport is "a very high risk operation involving

the possibility of catastrophic consequences to human life and health."  ***Id.* at 74**.  The court noted

evidence at trial showing that the City had declined to follow the advice of an FAA circular

regarding safety measures designed to prevent fueling errors.  "That circular recommended tank

vehicles be conspicuously marked with color contrasting lettering at least twelve inches high on the sides and rear of the vehicle.  In addition color-coded nozzles and hoses were recommended and emphasis was placed upon the training of fueling personnel.  The [C]ity rejected the nozzle coding suggestions because they would be inconvenient if nozzles were transferred from truck to truck."  *Id.* **at 77**.  Finally, the evidence showed that the City failed to supervise the activities of the fueling company whose employee caused the crash:  "An officer of [the fueling company] testified that it did not have regular meetings with the airport officials about [the company's] operations and that the only times it really did have 'infrequent meetings' is about renegotiating the lease.  He also testified that to his knowledge the airport officials did not review or inspect or analyze [the company's] fueling procedures or fueling equipment."  *Id*.

The ***Blum*** court concluded that the evidence was sufficient to support an award of damages for aggravating circumstances:

> Given the potential for disaster to both crew personnel and the general public, the federal regulation imposing an affirmative supervisory duty on the City, and the failure of the key city employee to be aware of that duty or to in any way seek to comply with the duty, we do not find the submission of aggravating circumstances erroneous.  It was the duty of the City to see that operations at its airport were conducted safely by itself and its tenants.  For its key employee to be unaware of the existence of that duty and to fail to even investigate or discuss such safety with [the fueling company] evidences a complete indifference to and conscious disregard for the safety of others.

**762 S.W.2d at 77**.  In this case the evidence suggests that B & W was aware of its duty under FHWA regulations, but deliberately ignored it, with the catastrophic consequences that occurred on February 4, 2005, on Interstate 44.  "Submission of aggravating circumstances is proper when the defendant could have reasonably been charged with knowledge of a potentially dangerous situation but failed to act to prevent or reduce the danger."  *Id.* **at 73**.  ***See also First Nat'l Bank of Fort Smith v. Kansas City S. Ry. Co.*, 865 S.W.2d 719, 730 (Mo. Ct. App. 1993) (finding that an**

**employee's conscious violation of railroad safety rules was sufficient to create a submissible**

**issue for the jury on aggravating circumstances);** *Kilmer v. Browning***, 806 S.W.2d 75, 80**

**(Mo. Ct. App. 1991) (an award of damages for aggravating circumstances in a wrongful death**

**action against a landlord was supported by evidence that the landlord ignored the condition**

**of the premises except when notified by tenants of the problem, that ventilating pipes in**

**the heating system on the premises had been rusting for at least five years, and that**

**deterioration of the pipes resulted in the escape of carbon monoxide into the apartment where**

**a tenant died)**.[1]

---

1.     The conclusion that there are genuine issues for trial as to aggravating circumstances also is supported by cases from other jurisdictions involving facts similar to those presented by this case. ***See Came v. Micou***, **No. 4:04-CV-1207, 2005 WL 1500978, at \*\*4-7 (M.D. Pa. June 23, 2005) (the court denied a motion for partial summary judgment as to a claim for punitive damages against a trucking company where the evidence showed that the company's driver was in violation of FHWA hours of service regulations, was operating his vehicle in a state of fatigue, and falsified his logs to avoid detection, and that the carrier should have been aware of the regulatory violations but failed to employ an effective procedure to monitor hours of service violations);** *Perez Librado v. M.S. Carriers, Inc.***, No. Civ.A.3:02-CV-2095-D, 2004 WL 1490304, at \*\*3-6 (N.D. Tex. June 30, 2004) (denying summary judgment as to a request for punitive damages against a motor carrier in a suit arising from a car-truck collision allegedly caused by violations of FMCSRs);** *Osborne Truck Lines, Inc. v. Langston***, 454 So. 2d 1317, 1326 (Ala. 1984) (in a personal injury action arising from a car-truck collision at the gate of a metal plant, evidence that the driver of the truck, who had an unobstructed view of oncoming traffic, acted with reckless disregard of the presence of other vehicles in making a left turn at the gate at night, that the driver was fatigued due to the inordinate length of time he had driven the truck, and that the driver continued to drive with knowledge of his fatigue, was sufficient to sustain a claim of wantonness against the driver and the carrier who employed him);** *Torres v. North Am. Van Lines, Inc.***, 658 P.2d 835, 839 (Ariz. Ct. App. 1982) (the issue of punitive damages may be properly submitted to the jury on the theory of a carrier's failure to police and enforce FHWA hours of service regulations where the employer had been put on notice that drivers were not complying with the regulations, with no attempt being made to take corrective measures, so that it could be implied that the carrier authorized sloppy logging of on-duty time with the concomitant risk of exceeding the time limitation, thus causing fatigue);** *Briner v. Hyslop***, 337 N.W.2d 858, 867-68 (Iowa 1983) (in a wrongful death action arising from a car-truck collision, holding that the jury should decide the question of whether a carrier owed punitive damages, since there was evidence that the carrier knew or should**

## CONCLUSION

For the foregoing reasons, the Court **DENIES** the Motion for Summary Judgment

on Punitive Damages brought by Defendant B & W Cartage Company, Inc. (Doc. 52).

**IT IS SO ORDERED.**

**DATED this 13ᵗʰ day of April, 2006.**

> s/ Michael J. Reagan
> **MICHAEL J. REAGAN**
> **United States District Judge**

---

**have known of its drivers' sleeping habits from their phone calls and their gas and motel slips, that it had no set schedules or guidelines for its drivers, that it did not have any established time for reviewing the logs kept by its drivers, that 120 days could pass before the drivers' logs were reviewed, that the carrier knew that the driver in question had not kept a log for the three weeks prior to the collision and that he had previously failed to keep a log, and that the carrier provided drivers with an incentive to work long hours without getting sufficient sleep); *Smith v. Printup*, 866 P.2d 985, 1007-08 (Kan. 1993) (in a wrongful death action by the survivors of victims killed in an accident with a truck seeking punitive damages against the truck driver's employers, holding that ratification and authorization are broad enough to encompass evidence that the driver's employers knew or should have known about employee misconduct in violation of FHWA regulations, and evidence of corporate policies, procedures, or managerial behavior that a jury reasonably could infer implicitly authorized or ratified the questioned conduct); *Elbar, Inc. v. Claussen*, 774 S.W.2d 45, 48-50 (Tex. App. 1989) (the jury's finding that a trucking firm was guilty of gross negligence in connection with an accident in which a truck entered a motorcyclist's lane, causing him to lose control, was supported by evidence that the firm's policy of requiring its drivers to operate their trucks for long, continuous periods of time lent itself to fatigue).**